## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JULIE RUIZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONAGRA BRANDS, INC.,<br><br>Defendant, | CASE NO. 1:22-cv-2421<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Julie Ruiz ("Plaintiff") individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant Conagra Brands, Inc. ("Conagra" or "Defendant") and allege the following based on personal knowledge as to herself, and as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE ACTION

1.    This action concerns Conagra's false and misleading labeling of its Angie's BOOMCHICKAPOP® microwave popcorn products ("PFAS Popcorn" or "Products")[1], which are prominently labeled as containing "only real ingredients," "ingredients sourced from nature,"

---

[1] The action concerns varieties of Angie's BOOMCHICKAPOP® microwave popcorn products, which, based on information and belief, utilize a substantially similar (if not identical) microwave popping bag. As alleged herein, Conagra conceals the inclusion of PFAS in its Products from consumers. Accordingly, discovery will reveal the exhaustive list of substantially similar Products that are included in this action.

and "Real, Simple Ingredients. Nothing Fake," when, in fact, Plaintiff's testing has revealed the

Products contain per- and polyfluoroalkyl substances ("PFAS").

2.     Conagra formulates, manufactures, markets and sells the Products, which it

uniformly represents as containing "only real, simple ingredients," and "nothing fake."[2]



---

[2] https://www.boomchickapop.com/microwave-popcorn/real-butter-microwave-popcorn (Last accessed April 16, 2021).

3. As one of North America's leading packaged food manufacturers, with products in 97% of America's households, Conagra knows the importance of marketing and labeling and the value of the label representations it carefully chooses for placement on its products.

4. Conagra intentionally uses the words "simple," "nature," and "real" to describe the source of its Products' ingredients.

5. "Simple" is defined as "not elaborate or artificial."[3] "Nature" is defined as "the physical world and everything in it that is not made by people."[4]

6. "Real" is defined as "produced using traditional methods and without artificial substances"[5] and "not fake, false, or artificial"[6] and thus likewise confirms for reasonable consumers that the Products will be free from ingredients that are artificial or human-made.

7. Reasonable consumers, therefore, fairly and reasonably understand that a product marketed as containing only "real, simple ingredients," "ingredients sourced from nature," and "nothing fake" would not contain human-made chemicals, let alone human-made chemicals known to be harmful.

8. However, despite Conagra's consistent and pervasive marketing of the Products as containing only real, simple ingredients sourced from nature, the Products actually contain significant levels of PFAS chemicals—a category of human-made chemicals with a toxic, persistent, and bioaccumulative nature which are associated with numerous health concerns.

---

[3] https://www.dictionary.com/browse/simple
[4] https://www.britannica.com/dictionary/nature
[5] https://dictionary.cambridge.org/us/dictionary/english/real
[6] https://www.britannica.com/dictionary/real

9.    Conagra knows that consumers are concerned with the ingredients in their food. Thus, Conagra has intentionally utilized its marketing, centering on its use of only "real," simple and naturally-sourced ingredients, to drive sales and increase profits, including by targeting health-conscious consumers who reasonably believe that the Products are free from unnatural or artificial ingredients like harmful human-made chemicals.

10.    The presence of PFAS chemicals in the Products is entirely inconsistent with Conagra's uniform representations and renders them "unnatural" and not "real" or "simple" by definition.

11.    As a result of Conagra's misconduct, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

12.    Plaintiff brings this suit to halt Conagra's dissemination of false and misleading representations and to correct the false and misleading perception that Conagra's representations have created in the minds of reasonable consumers.

13.    Plaintiff seeks damages, injunctive relief, and other equitable remedies for herself and for the proposed classes.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

4

15.     This Court has personal jurisdiction over Defendant because it is headquartered in this District, Defendant has substantial aggregate contacts with this District, including engaging in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of Illinois.

16.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District, Defendant transacts business in this District, and Defendant has intentionally availed itself of the laws and markets within this District.

## PARTIES

17.     At all relevant times, Plaintiff Julie Ruiz has resided in San Bernadino County, California.

18.     Conagra Brands, Inc. is incorporated in Delaware with its principal place of business located at 222 W. Merchandise Mart Plaza, Suite 1300, Chicago, Illinois.

## FACTUAL ALLEGATIONS

### Angie's BOOMCHICKAPOP® Microwave Popcorn Products

19.     Microwave popcorn is a popular snack item enjoyed by millions of consumers. Since it was first introduced in the 1980s, it has made up a significant portion of the snack food market. As the COVID-19 pandemic forced millions of Americans to spend more time at home, the microwave popcorn industry increased nearly 15% percent, making it a $1.0 billion dollar category of the snack food industry.[7]

---

[7] *Popcorn Sales Pop Off With Rise In At-Home Consumption Occasions, Gifting*, CANDY & SNACK TODAY, https://candyusa.com/cst/popcorn-sales-pop-off-with-the-rise-of-at-home-consumption-occasions-gifting/ (Last accessed March 22, 2022).

20. Popcorn is popular for a variety of reasons, but its relative healthfulness is chief among them. Popcorn is a whole-grain that is naturally low in fat and calories, sugar-free, and gluten-free, making it a good fit for a variety of diets and health-conscious lifestyles.[8]

21. The Products at issue are microwave popcorn products sold under the Angie's BOOMCHICKAPOP® brand name.

22. Defendant Conagra Brand's Inc. acquired Angie's BOOMCHICKAPOP® in 2017.

23. Prior to its acquisition, and continuing through the present, the Angie's BOOMCHICKAPOP® brand has been recognized by consumers as a healthy and natural snack brand that is free from artificial ingredients. This perception is supported by the brand's mission statement[9]:

> Angie's BOOMCHICKAPOP® has a simple belief: Make a better-for-you snack with real, simple ingredients. After all, when it comes to everyday snacking, what people want is whole grain. Not a list of words that make you tired just trying to pronounce them.

24. At the time of Conagra's acquisition, Angie's BOOMCHICKAPOP® was only available as a ready-to-eat bagged popcorn. In October 2018, Conagra introduced Angie's BOOMCHICKAPOP® microwave popcorn.[10]

25. The Products are sold in three flavors: Real Butter Popcorn, Sea Salt Popcorn and Lightly Sweet Kettle Corn.

26. The Products are sold at mass market retailers and grocery stores throughout the United States, including Target, Walmart, Publix, Meijer's, and Walgreens, as well as authorized online retailers such as Amazon.

---

[8] *All About Popcorn*, POPCORN.ORG, https://www.popcorn.org/All-About-Popcorn/Our-Story (Last accessed March 22, 2022).
[9] https://www.conagrafoodservice.com/products/angies
[10] https://www.conagrabrands.com/news-room/news-angies-boomchickapop-continues-growth-and-innovation-with-launch-of-microwave-popcorn-prn-122651 (Last accessed April 16, 2022)

27.     Microwave popcorn, including the Products at issue in this case, is prepared by heating a specially designed bag that contains unpopped popcorn kernels and any additional additives, such as butter and salt. The bag is placed directly in the microwave where the heat from cooking pops the kernels, creating the finished popcorn product.

28.     Based on information and belief, all of the Products utilize a substantially similar, if not identical, microwave popping bag.

***Defendant's False and Deceptive Advertising***

29.     Conagra uniformly represents the Products as a food that is made with "real, simple ingredients," "nothing fake," and "ingredients sourced from nature" (collectively, "Real and Naturally-Sourced Ingredient Representations").

30.     The Real and Naturally-Sourced Ingredient Representations appear prominently on the front[11] and sides[12] of the Products' packaging:

[11] https://www.boomchickapop.com/microwave-popcorn/real-butter-microwave-popcorn (Last accessed April 16, 2021).
[12] https://www.rossgranvillemarket.com/shop/pantry/snacks_chips_and_dips/popcorn/unpopped/boomchickapop_microwave_sea_salt_popcorn_4_ea/p/1564405684703356929



31.     The Real and Naturally-Sourced Ingredient Representations also appear on the Products' individual microwave bags[13]:



---

32.    The Real and Naturally-Sourced Ingredient Representations are central to Conagra's marketing and sale of its Products and are strategically employed to convince consumers that the Products are free of unnatural or artificial ingredients, including toxic human-made ingredients.

33.    Conagra corroborates its label statements on its website by featuring images of the boxes with the Real and Naturally-Sourced Ingredient Representations, describing the Products as made with "just the good stuff" and "nothing fake"[14]:



34.    Conagra also promotes its PFAS Popcorn on its social media accounts by posting images of the Products' boxes and which contain the Real and Naturally-Sourced Ingredient Representations, along with additional representations about the Products' ingredients[15]:

---

[14] https://www.boomchickapop.com  (Last accessed April 20, 2022).

[15] https://www.instagram.com/p/BpPektVBz9A (Last accessed April 16, 2022).





35. Further, Conagra is intentional in its design of the Real and Naturally-Sourced Ingredient Representations. Conagra admits that it purposefully designs its product labeling as "simple enhancements" designed to entice health-conscious consumers by helping them "make better-informed food choices to improve their diet and health."[16]

36. Conagra's focus on its "real" and "simple" labeling carries through all aspects of its marketing. Conagra uses "SmartLabel" – an online resource that provides consumers with detailed information on products' ingredients and other attributes.[17]

37. For example, the Real Butter flavor is described as being made with just a few ingredients[18]:



**Boom Chicka Pop, Microwave Popcorn, Real Butter, 4 Classic Bags**
4-3.29 OZ (93.3g) BAGS NET WT 13. 16 OZ (373.2g)

| Nutrition | Ingredients | Allergens |
|---|---|---|

Whole Grain Popcorn

Pressed Palm Oil

Butter

Sea Salt

---

[16] https://www.conagrabrands.com/our-company/overview/company-milestones (Last accessed April 13, 2022).

[17] https://www.smartlabel.org/faq

[18] https://smartlabel.labelinsight.com/product/6376409/other/claims (Last accessed April 6, 2022).

38.     Conagra also spotlights its "free from" product attributes on the Products' boxes and its online marketing of the Products, in an effort to bolster its Natural Ingredient Claims[19]:



39.     Conagra is well aware that the future success of its business is dependent on its ability to meet consumer demand for food products that exclude ingredients which are known or suspected to be harmful to human health. In assessing potential risks to its sales and profits, Conagra has acknowledged that "[h]ealth care issues facing the United States and health-conscious consumer expectations have put increasing pressure on the food industry to constantly

---

[19] https://www.boomchickapop.com/about-us (Last accessed April 21, 2022).

evaluate the nutritional profiles of its products. If our products fail to keep up with health trends and consumer expectations, our business performance may be negatively impacted."[20]

40.     Conagra is also aware that its business could be affected by consumer concerns or perceptions regarding the health effects of certain product ingredients.[21] Accordingly, Conagra's brand portfolio—and more importantly, its marketing of those brands—has evolved to satisfy changing food preferences, such as demand for products that eliminate unnatural, human-made, or toxic chemicals.

41.     Conagra's acquisition of Angie's BOOMCHICKAPOP® was part of this evolution. In an October 2018 press release, Conagra stated: "We see great potential for Angie's BOOMCHICKAPOP to continue growing as we focus on bringing the attributes consumers look to the brand for – flavorful snacks made with *real, simple ingredients* – into new products and categories. With Angie's BOOMCHICKAPOP Microwave Popcorn, we saw an opportunity to create a new experience for our fans: enjoying a hot, freshly popped bowl of our flavorful popcorn *while feeling good about what they're eating*."[22] (emphasis added)

42.     To further distinguish itself from its competitors in its effort to appeal to health-conscious consumers, and to garner the trust of those consumers, Conagra has also engaged in a public relations campaign in which it represents itself as being transparent about the ingredients in its products:

---

[20]https://www.conagrabrands.com/sites/g/files/qyyrlu371/files/2016-10/ConAgra%20Corporate%20Responsibility%20Report_2011.pdf (Last accessed April 14, 2022).

[21] https://www.sec.gov/ix?doc=/Archives/edgar/data/0000023217/000156459021037738/cag-10k_20210530.htm

[22] https://www.conagrabrands.com/news-room/news-angies-boomchickapop-continues-growth-and-innovation-with-launch-of-microwave-popcorn-prn-122651

14



**CONTENTS** > GOOD FOOD

# Product Transparency

Conagra Brands is committed to providing access
to the information consumers want and need to
make informed decisions about what they eat.

Image 2.[23]

43.     Conagra claims to "take food safety seriously every step of the way—from sourcing safe ingredients, to implementing appropriate shipping and storage, to packaging our food with clear and safe directions for microwave preparation."[24]

44.     Conagra further represents that "[t]hrough nutrition panels, ingredient statements and responsible marketing, we maintain open, honest communication with our stakeholders."[25]

***PFAS Chemicals and Associated Risks***

45.     PFAS are a category of highly persistent and potentially harmful <u>human-made chemicals</u>.[26]

46.     PFAS are <u>not naturally occurring</u>.[27] They were first developed by scientists in the 1940s.[28] Thus, they are indisputably "unnatural" and not "real" or "simple."

47.     The human-made PFAS chemicals, which are in the PFAS Popcorn, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

---

[23]https://www.conagrabrands.com/citizenship-reports/conagra-brands-citizenship-report-2021 (Last accessed April 14, 2022).
[24] https://www.conagrabrands.com/our-company/corporate-social-responsibility/food-safety (Last accessed April 14, 2022).
[25] https://www.conagrabrands.com/our-company/corporate-social-responsibility/food-quality-safety
[26] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited Nov. 27, 2021).
[27] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html
[28] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/

48. Diet is considered a major route of PFAS exposure for humans, and reasonable consumers purchasing products represented as containing ingredients that are "real," "simple," "sourced from nature" and "nothing fake" would not expect those products to contain harmful human-made chemicals, such as PFAS.[29]

49. PFAS chemicals have been associated with a variety of negative health effects for humans and the environment. The health risks associated with PFAS include, but are not limited to, decreased male and female fertility, negative developmental effects or delays in children, increased risk of cancers, liver damage, asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.[30]

50. According to the Environmental Protection Agency, limiting exposure to PFAS can help protect individual health. "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[31]

51. Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS.[32]

---

[29] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092
[30] *See* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas; [30] Center for Disease Control and Prevention Agency for Toxic Substances and Disease Registry, *What are the health effects of PFAS?*, U.S. DEPT. OF HEALTH AND HUMAN SERVS., https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last visited Nov. 27, 2021); Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, N.Y. TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.
[31] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk
[32] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-toxic-forever-chemicals#How-to-limit-PFAS-exposure

52.     Conagra is well aware of this, which is exactly why it has engaged in an aggressive, uniform marketing campaign intended to convince consumers that the Products are real and sourced from nature sourced

53.     Conagra has engaged in this uniform marketing campaign in an effort to convince reasonable consumers to believe that the Products are superior to other products that are not real or sourced from nature.

54.     Reasonable consumers purchasing the Products would believe, based on Conagra's real and sourced from nature representations, that the Products do not contain unnatural or human-made chemicals that could adversely impact their health.

***PFAS Use in Microwave Popcorn Bags***

55.     Food contact materials, such as wrappers and packaging, are often treated with PFAS to increase water and grease resistance and enhance the material's non-stick properties.[33] PFAS can also help ingredients from leaking out of their packaging.[34]

56.     The use of PFAS chemicals in food contact materials is concerning because studies have confirmed that PFAS migrates to food, where it is then ingested by consumers. [35]

57.     Compared with other types of materials that come into contact with food, microwave popcorn bags have among the highest concentrations of PFAS chemical migration. [36]

---

[33] https://saferchemicals.org/wp-content/uploads/2018/12/saferchemicals.org_take_out_toxics_pfas_chemicals_in_food_packaging.pdf?x15132 (Last accessed April 21, 2022).; *See also* Begley TH, Hsu W, Noonan G, Diachenko G. Migration of fluorochemical paper additives from food-contact paper into foods and food simulants. Food Addit Contam Part A Chem Anal Control Expo Risk Assess. 2008 Mar;25(3):384-90. doi: 10.1080/02652030701513784. PMID: 18311629.
[34] https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092
[35] *Migration of fluorochemical paper additives from food-contact paper into foods and food simulants*, Food Additives & Contaminants, https://doi.org/10.1080/02652030701513784
[36] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092

58.     In fact, studies show that consumption of microwave popcorn is associated with higher PFAS chemical levels in humans as a direct consequence of PFAS migration from microwave popcorn bags; furthermore, consuming microwave popcorn creates significantly higher exposure to PFAS in humans than other foods that come into contact with packaging materials containing PFAS.[37]

59.     Part of the reason that microwave popcorn creates a unique risk of PFAS exposure to humans is due to the fact that PFAS chemical migration increases with higher temperatures, longer contact time with the treated packaging, and the presence of emulsifiers.[38] All of these factors are present when preparing popcorn.

60.     Studies have shown that oil containing even small amounts of an emulsifier—as is present in the Products[39]—can significantly enhance migration of a fluorochemical from paper.[40] Additionally, studies have shown that salt—also present in the Products—increases the migration of PFAS chemicals to food.[41]

---

[37] Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food - PMC (nih.gov)

[38] Dietary Habits Related to Food Packaging and Population Exposure to PFASs | Environmental Health Perspectives | Vol. 127, No. 10 (nih.gov)

[39] Based on information and belief, Conagra uses palm oil as an emulsifier in its Products. *See https://productswithoutpalmoil.com/palm-oil-uses-what-is-palm-oil-used-for/#Why_palm_oil_is_used_in_food*

[40] *Migration of fluorochemical paper additives from food-contact paper into foods and food simulants*, Food Additives & Contaminants, https://doi.org/10.1080/02652030701513784

[41] *Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food*, Foods., https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8306913/

61.     Studies have also found that PFAS chemicals are in the vapors from cooked microwave popcorn bags, indicating the potential for inhalation exposure when the bags are opened by consumers.[42]

***Plaintiff's Independent Testing Confirms the Presence of PFAS Chemicals in the Products***

62.     Plaintiff sought independent third-party testing to determine whether the Products' bags contain PFAS chemicals.

63.     Plaintiff's independent testing was conducted in accordance with accepted industry standards for detecting whether the Products contain organic fluorine, which is a surrogate for PFAS chemicals.

64.     There are more than 12,000 PFAS chemicals currently in existence.[43] Accordingly, it is impractical, if not impossible, for scientists and researchers to test for the presence of each of these 12,000 chemicals in any particular sample.

65.     The presence of organic fluorine in a sample, however, indicates the sample contains PFAS, and is therefore a widely-accepted method of determining whether a sample contains PFAS.

66.     Here, Plaintiff's testing detected the presence of **51 ppm** of organic fluorine in   the Products.

67.     Plaintiff's testing demonstrates that the Products contain levels of unnatural, human-made PFAS chemicals in the Products in direct opposition to Conagra's uniform representations.

***Defendant's Unlawful Conduct***

---

[42] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092
[43] https://comptox.epa.gov/dashboard/chemical-lists/pfasmaster (Last accessed April 11, 2022).

68.     At all times relevant to this action, Conagra has been aware that its Products utilize PFAS chemicals to create grease resistance and/or enhance non-stick properties when cooking popcorn.

69.     Since at least January 2006, Conagra has acknowledged to the public that it sells microwave popcorn in packaging coated with PFAS, including in a January 31, 2006 article in the Wall Street Journal.[45]

70.     Since at least 2006, shareholders have urged Conagra's Board of Directors to consider eliminating the use of PFAS in its food packaging, including in microwave popcorn.[46]

71.     Since at least 2006, consumers have expressed concern about the use of PFAS in Conagra's products, including by sending more than 13,500 personal letters to grocery store managers which asked grocery stores to discontinue the sale of food utilizing PFAS in its packaging. Conagra was aware of this grass roots campaign, which was organized by advocacy group Ohio Citizen Action, and responded by issuing a cease-and-desist letter to the organization.[47]

72.     To capitalize on increasing consumer demand for products free from artificial ingredients, including harmful human-made chemicals like PFAS, Conagra has knowingly and willfully deployed a concerted strategy to distinguish its Products from competing options in the highly competitive snack industry by representing its PFAS Popcorn as a product free from artificial ingredients.

73.     Throughout the class period, Conagra has targeted health-conscious consumers by falsely and misleadingly representing its Products are only made with "real" and "simple"

---

[45] https://www.wsj.com/articles/SB113867354944860566
[46] https://iehn.org/resources/resolution/conagra-pfoa-related-chemicals-in-product-packaging
[47] https://www.healthandenvironment.org/partnership_calls/363

ingredients from "natural sources" with "nothing fake." Consequently, reasonable consumers believe the Popcorn is free of unnatural, human-made chemicals.

74. Conagra's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell products which contain only real and simple ingredients from natural sources, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Products.

75. Further, Conagra's claims touting it bona fides as a company dedicated to natural, clean products and sustainability, in conjunction with its conspicuous representations pertaining to the Products' other attributes that consumers associate with products free from artificial ingredients, further contribute to the reasonable consumer perception and belief that the Products contain only natural ingredients and are free of human-made chemicals.

76. Consumers lack the expertise to ascertain the true ingredients in Conagra's Products prior to purchase. Accordingly, reasonable consumers must, and do rely on Conagra to accurately and honestly advertise its Products' ingredients as real, simple and natural, and not contradict those representations by using unnatural human-made chemicals in its Products that are known to contaminate food upon cooking and which pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

77. Conagra's representations that the Products contain only naturally-sourced, "real" ingredients, including *inter alia*, the Real and Naturally-Sourced Ingredient Representations described herein, are false because products containing toxic, human-made ingredients like PFAS are unnatural and not real by definition.

78. Conagra's Real and Naturally-Sourced Ingredient Representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiff and Class members regarding the

presence of PFAS chemicals in its Products. Accordingly, these acts and practices by Conagra are deceptive.

79.     Customers reasonably relied on Conagra's false statements and misleading representations, and reasonably expected that Conagra's Products would conform with its Real and Naturally-Sourced Ingredient Representations and, as such, would not contain unnatural, human-made PFAS chemicals.

80.     Conagra's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render its Products worthless or less valuable.

81.     Plaintiff purchased the Products because she wanted microwave popcorn that did not contain artificial or chemical ingredients not from natural sources.

82.     If Conagra had disclosed to Plaintiff and putative Class Members that its Popcorn contained PFAS chemicals, Plaintiff and putative Class Members would not have purchased Conagra's PFAS Popcorn or they would have paid less for the products.

83.     Plaintiff and Class Members were among the intended recipients of Conagra's deceptive representations and omissions described herein.

84.     Conagra's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

85.     The materiality of the representations described herein also establishes causation between Conagra's conduct and the injuries Plaintiff and the Class Members sustained.

86.     Alternative formulations, designs and materials for enhancing grease control and non-stick properties were available to Conagra at the time it formulated, designed and manufactured its PFAS Popcorn, and such alternative formulations and designs were and are

used by other manufacturers to produce and sell natural, PFAS-free microwave popcorn. These alternatives include greaseproof vegetable parchment paper and non-fluorinated coatings using aqueous dispersions of waxes, starch, or cellulose gum.[48] In fact, studies have shown that most PFAS alternatives in food packaging are cost-neutral for retailers.[49]

87.    Dating back to at least 2006, Conagra committed to study alternatives to eliminate PFAS in microwave popcorn packaging, but based on information and belief, has failed to implement any significant changes.[50]

88.    Conagra is aware that consumers, including its own shareholders, are concerned about the use of PFAS in its Products, yet it has continued to market and advertise its Products using the Real and Naturally-Sourced Ingredient Representations in order to profit off of unsuspecting consumers, including Plaintiff and Class Members.

89.    The presence of PFAS chemicals in Conagra's Products is entirely inconsistent with its Real and Naturally-Sourced Ingredient Representations.

90.    Conagra's knowingly false and misleading Real and Naturally-Sourced Ingredient Representations have the intended result of convincing reasonable consumers that its Products are made from only "real" and "natural" ingredients and therefore do not contain unnatural, human-made toxic chemicals. No reasonable consumer would consider Conagra's Products as containing only natural or real ingredients if they knew that the Products' packaging

---

[48] Ramírez Carnero A, Lestido-Cardama A, Vazquez Loureiro P, Barbosa-Pereira L, Rodríguez Bernaldo de Quirós A, Sendón R. Presence of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) in Food Contact Materials (FCM) and Its Migration to Food. *Foods*. 2021; 10(7):1443. https://doi.org/10.3390/foods10071443

[49] https://norden.diva-portal.org/smash/get/diva2:1201324/FULLTEXT01.pdf
[50] https://www.sehn.org/sehn/news-release-toxics-in-your-portfolio-companies-facing-shareholder-resolutions-on-chemical-risks-in-products-jump-from-just-three-in-04-05-to-17-in-06-07

contained harmful, unnatural, human-made PFAS chemicals which migrate into and contaminate the Product when following Conagra's cooking instructions.

91.     Conagra's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and Class Members.

92.     In making the false, misleading, and deceptive representations, Conagra knew and intended consumers would pay a premium for the Products over comparable products that are not made from naturally sourced or real, simple ingredients.

93.     Plaintiff and Class Members all paid money for the Products, however, they did not obtain the full value of the advertised Products due to Conagra's misrepresentations as detailed herein. Plaintiff and Class Members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products' unnatural, human-made, and harmful ingredients. Thus, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Conagra's wrongful conduct.

94.     Conagra's widespread marketing campaign portraying the Products as only containing ingredients from "natural sources" and otherwise representing them to be simple and real as detailed herein, is misleading and deceptive to consumers because the Products are made with unnatural, human-made, and toxic ingredients. Plaintiff brings this action on behalf of the proposed Classes to stop Conagra's misleading practices.

***Plaintiff's Individual Facts***

95.     Plaintiff Julie Ruiz is a citizen of Illinois and resides in San Bernadino County.

96.     For two years or more during the Class Period, Plaintiff purchased Conagra's Products in California.

97.     In or around November 2021, Plaintiff most recently purchased Conagra's Sea Salt Popcorn from a Walmart located in Hesperia, California.

98.     Plaintiff purchased the Products every two weeks on average.

99.     Prior to purchasing the Products, Plaintiff reviewed the Products' labels and relied on Conagra's Real and Naturally-Sourced Ingredient Representations thereon.

100.    In reasonable reliance on the Real and Naturally-Sourced Ingredient Representations, Plaintiff paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading.

101.    Conagra's Real and Naturally-Sourced Ingredient Representations were part of the basis of the bargain in that Plaintiff attributed value to Conagra's representations and Plaintiff would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Real and Naturally-Sourced Ingredient Representations were untrue and/or misleading.

102.    Plaintiff paid a price premium for empty promises that the Products were free of harmful chemicals.  Should Plaintiff encounter any of the Products in the future, she cannot rely on the truthfulness of the labels' statements absent corrective advertising.  If Conagra takes corrective action to ensure the truthfulness of the Real and Naturally-Sourced Ingredient Representations and/or correct the Products' labels, Plaintiff would consider buying the Products in the future.

## INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM

103.    Conagra's wrongful conduct harms the public-at-large.

104. PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and potentially human-made chemicals that have been associated with numerous negative health effects for humans and harmful environmental impacts.

105. PFAS chemicals known to negatively impact the human body and the environment including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

106. Because Conagra's deceptive advertising is ongoing and directed to the public, and because Conagra continues to sell its Products containing PFAS chemicals, the deception poses an ongoing risk to the public.

107. As such, a public injunction must be provided in order to enjoin Conagra's continued harm of consumers and the public-at-large.

## **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

108. Conagra has had actual knowledge since at least 2006 that its Products contained unnatural, human-made PFAS chemicals which pose a risk of harm to human health.

109. Although Conagra was aware of the deception in its advertising, marketing, packaging, and sale of its Products given the inclusion of PFAS chemicals, it took no steps to disclose to Plaintiff or Class Members that its Products contained PFAS chemicals.

110. Despite its knowledge, Conagra has fraudulently misrepresented the Products as having qualities and characteristics they do not, while concealing the fact that its Products contain PFAS chemicals.

111. Conagra made, and continues to make, affirmative false statements and misrepresentations to consumers, to promote sales of its Products, including its Real and Naturally-Sourced Ingredient Representations.

112. Conagra misrepresented and concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Products. Conagra's misrepresentation and concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members. Accordingly, Plaintiff and Class Members reasonably relied upon Conagra's misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

113. The PFAS chemicals in the design and/or manufacture of Conagra's Products was not reasonably detectible to Plaintiff and Class Members.

114. At all times, Conagra actively and intentionally misrepresented the qualities and characteristics of the Products, while concealing the existence of the PFAS chemicals and failing to inform Plaintiff or Class Members of the existence of the PFAS chemicals in its Products. Accordingly, Plaintiff's and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

115. Conagra's statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Products contained unnatural, human-made PFAS chemicals.

116. Conagra misrepresented the Products and concealed the PFAS chemicals for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

117. As a result of Conagra's intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiff and Class Members of the PFAS chemicals,

any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Conagra is estopped from relying on any statutes of limitations in light of its intentional misrepresentations and active concealment of the inclusion of unnatural, human-made PFAS chemicals in the Products.

118.    Further, the causes of action alleged herein did not occur until Plaintiff and Class Members discovered that the Products contained PFAS chemicals. Plaintiff and Class Members had no realistic ability to discern that the Products contained PFAS chemicals until they learned of the existence of the PFAS chemicals. In either event, Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Conagra's active concealment of the existence and true nature of the PFAS Popcorn.

## FED. R. CIV. P. 9(b) ALLEGATIONS

119.    Although Conagra is in the best position to know what content it placed on its packaging, website(s), and social media sites during the relevant timeframe, and the knowledge that it had regarding the PFAS chemicals and its failure to disclose the existence of PFAS chemicals in the Products to Plaintiff and consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

120.    **WHO**: Conagra made its Real and Naturally-Sourced Ingredient Representations on the Products' packaging, online, and in its marketing and advertising of the Products.

121.    **WHAT**: Conagra's conduct here was, and continues to be, deceptive and fraudulent because of its Real and Naturally-Sourced Ingredient Representations. Thus, Conagra's conduct deceived Plaintiff and Class Members into believing that the Products were manufactured and sold with the represented qualities. Conagra knew or should have known this information is material to

reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products as possessing qualities they do not.

122. **WHEN**: Conagra made material misrepresentations, false statements and/or omissions during the putative Class periods and at the time Plaintiff and Class Members purchased the Products, prior to and at the time Plaintiff and Class Members made claims after realizing the Products contained unnatural, human-made chemicals, and continuously throughout the applicable Class periods.

123. **WHERE**: Conagra's marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Products' packaging, as well as on website(s) and social media accounts used to market and advertise the Products.

124. **HOW**: Conagra made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Products.

125. **WHY**: Conagra made false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products over other brands that did not make similar Real and Naturally-Sourced Ingredient Representations, the effect of which was that Conagra profited by selling the Products to many thousands of consumers.

126. **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent Conagra's misrepresentations, false and misleading statements.

## CLASS ACTION ALLEGATIONS

127.     Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following proposed nationwide class ("Nationwide Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the United States within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

128.     Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following proposed multi-state class ("Multi-State Consumer Protection Class")

> **During the fullest period allowed by law, all persons who purchased the Products in the States of California, Florida, Illinois, New York, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, Washington or any state with similar laws[51] within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

---

[51] While discovery may alter the following, Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: Arkansas (Ark. Code § 4-88-101, et seq.); Colorado (Colo. Rev. Stat. § 6-1-101, et seq.); Connecticut (Conn. Gen. Stat. § 42-110, et seq.); Delaware (Del. Code tit. 6, § 2511, et seq.); District of Columbia (D.C. Code § 28-3901, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Hawaii (Haw. Rev. Stat. § 480-1, et seq.); Idaho (Idaho Code § 48-601, et seq.); Illinois (815 ICLS § 505/1, et seq.); Maine (Me. Rev. Stat. tit. 5 § 205-A, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. § 407.010, et seq.); Montana (Mo. Code. § 30-14-101, et seq.); Nebraska (Neb. Rev. Stat. § 59 1601, et seq.); Nevada (Nev. Rev. Stat. § 598.0915, et seq.); New Hampshire (N.H. Rev. Stat. § 358-A:1, et seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New Mexico (N.M. Stat. § 57-12-1, et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); North Dakota (N.D. Cent. Code § 51-15-01, et seq.); Oklahoma (Okla. Stat. tit. 15, § 751, et seq.); Oregon (Or. Rev. Stat. § 646.605, et seq.); Rhode Island (R.I. Gen. Laws § 6-13.1-1, et seq.); South Dakota (S.D. Code Laws § 37-24-1, et seq.); Texas (Tex. Bus. & Com. Code § 17.41, et seq.); Virginia (VA Code § 59.1-196, et seq.); Vermont (Vt. Stat. tit. 9, § 2451, et seq.); Washington (Wash. Rev. Code § 19.86.010, et seq.); West Virginia (W. Va. Code § 46A-6- 101, et seq.); and Wisconsin (Wis. Stat. § 100.18, et seq.). *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

129. Plaintiff brings this action individually and as a representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following class ("California Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of California within the applicable statute of limitations for personal use and not resale, until the date notice is disseminated.**

130. Specifically excluded from these definitions are: (1) Conagra, any entity in which Conagra has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiff reserves the right to amend the Class definition as necessary.

131. <u>Numerosity</u>: The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of at least thousands of people throughout the United States, as well as in the states of Illinois and California. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable from information and records in the possession of Conagra.

132. <u>Typicality</u>: The claims of the representative Plaintiff are typical in that Plaintiff, like all Class Members, purchased the Products that were designed, manufactured, marketed, advertised, distributed, and sold by Conagra. Plaintiff, like all Class Members, have been damaged by Conagra's misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for a product containing PFAS chemicals which are known to pose a risk of harm to the human body. Furthermore, the factual basis of Conagra's misconduct is common to

all Class Members because Conagra has engaged in systematic deceptive and fraudulent behavior that was deliberate and results in the same injury to all Class Members.

133. <u>Commonality</u>: Common questions of law and fact exist as to all Members of the Class. These questions predominate over questions that may affect only individual Class Members because Conagra has acted on grounds generally applicable to the Class. Such common legal or factual questions include, *inter alia*:

a. Whether the Products contain PFAS chemicals;

b. Whether Conagra misrepresented that the Products contain only Real and Naturally-Sourced Ingredient Representations;

c. Whether Conagra's practices in marketing, advertising and packaging the Products tend to mislead reasonable consumers into believing that the Products are only made with real ingredients and ingredients from natural sources;

d. Whether Conagra omitted or failed to disclose material information to Plaintiff and Class Members regarding the Products;

e. Whether Conagra concealed from and/or failed to disclose to Plaintiff and Class Members that the Products contained PFAS chemicals;

f. Whether Conagra's breached express warranties relating to the Products;

g. Whether Conagra breached the implied warranty of merchantability relating to the Products;

h. Whether Conagra engaged in deceptive trade practices by selling, packaging, advertising and/or marketing the Products containing PFAS chemicals;

i. Whether Conagra engaged in false or misleading advertising by selling, packaging, and/or marketing the Products containing PFAS chemicals;

j. Whether Plaintiff and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

k. Whether Plaintiff and Class Members either paid a premium for the Products that they would not have paid but for its false Real and Naturally-Sourced Ingredient Representations or would not have purchased them at all;

l.   Whether Plaintiff and the other Class Members have been injured and the proper measure of their losses as a result of those injuries; and

m.   Whether Plaintiff and the other Class Members are entitled to injunctive, declaratory, or other equitable relief.

134.   <u>Adequate Representation</u>: Plaintiff will fairly and adequately protect the interests of Class Members. She has no interests antagonistic to those of Class Members. Plaintiff retained attorneys experienced in the prosecution of class actions, including consumer products, misrepresentation, mislabeling, and PFAS chemicals class actions, and Plaintiff intends to prosecute this action vigorously.

135.   <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Conagra will continue to commit the unlawful practices alleged herein, and Plaintiff and Class Members will continue to be deceived by Conagra's Real and Naturally-Sourced Ingredient Representations and unknowingly be exposed to the risk of harm associated with the PFAS chemicals in the Products. Conagra has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief, public injunctive relief, and corresponding declaratory relief are appropriate respecting the Class as a whole.  Injunctive relief, and specifically public injunctive relief, is necessary in this action.

136.   <u>Predominance and Superiority</u>: Plaintiff and Class Members have all suffered and will continue to suffer risk of harm and damages as a result of Conagra's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high given the average price point of the Products and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Conagra's misconduct. Absent a class action, Class Members will continue to incur damages, and Conagra's

misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

137.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

138.    Conagra has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

### COUNT I
**Violation of the California Consumer Legal Remedies Act ("CLRA")**
**California Civil Code §§ 1750, et seq.**
**(On Behalf of Plaintiff and the California Class)**

139.    Plaintiff, individually and on behalf of the California Class, brings this cause of action and hereby adopts and incorporates by reference all allegations contained in Paragraphs 1-138 as if set fully set forth herein.

140.    The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, et seq.

141.    The CLRA applies to all claims of Plaintiff and California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

142.    Plaintiff and California Class Members are "consumers" as defined by Civil Code § 1761(d).

143.    Defendant is a "person" as defined by California Civil Code § 1761(c).

34

144.     The Products qualify as "goods" as defined by California Civil Code § 1761(a).

145.     Plaintiff and the California Class Members' purchases of PFAS Popcorn Products are "transactions" as defined by California Civil Code § 1761(e).

146.     As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer unlawful:

> a.     "Representing that goods...have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which they do not have." Civil Code § 1770(a)(5); and
>
> b.     "Representing that goods...are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

147.     Defendant engages in unfair competition and/or unfair or deceptive acts or practices in violation of California Civil Code §§ 1770(a)(5) and (a)(7) when it represented through its advertising and other express representations, including the Real and Naturally-Sourced Ingredient Representations, that its Products have benefits or characteristics that they do not actually have.

148.     As detailed in this Complaint, Defendant repeatedly engaged in conduct deemed a violation of the CLRA, has made representations regarding the Products' benefits or characteristics that they do not in fact have, and has represented the Products to be of a quality that they are not. Indeed, Defendant has concealed this information from consumers, including Plaintiff and California Class Members.

149.     The Products are not made with "only real ingredients," "ingredients sourced from nature," or "Real, Simple Ingredients. Nothing Fake." As detailed above, Defendant violated the CLRA when it falsely represented that the Products meet a certain standard or quality.

150.     Further, Defendant's practice of advertising the Products with the intent not to sell them as advertised, and the knowledge that the Products are not as represented, violates the CLRA.

151.    Specifically, Defendant marketed and represented the Products with the Real and Naturally-Sourced Ingredient Representations when, in reality, the Products contain unnatural, harmful, and human-made PFAS chemicals.

152.    Defendant's deceptive practices are specifically designed to induce consumers, including Plaintiff and California Class Members, to purchase or otherwise acquire the Products.

153.    Defendant engages in uniform marketing, advertising, and packaging to reach consumers, including Plaintiff. California Class Members, their agents, and/or third parties upon whom they rely, to persuade them to purchase and use the Products manufactured by Defendant. Defendant's advertising, marketing, websites, social media sites and packaging contain numerous false and misleading statements relating to the quality of and ingredients contained within the Products. These include, *inter alia*, representations that the Products contain "only real ingredients," "ingredients sourced from nature," and "Real, Simple Ingredients. Nothing Fake."

154.    Despite these representations, Defendant omits and conceals information and material facts from consumers.

155.    Consumers, including Plaintiff and California Class Members, relied on Defendant's representations when they purchased the Products.

156.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

157.    On May 6, 2022, Plaintiff provided written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions pursuant to the CLRA.

158.    If Defendant does not thereafter correct its business practices, Plaintiff will amend (or seek leave to amend) the Complaint to add claims for monetary relief, including restitution and actual damages under the CLRA.

159.     Pursuant to California Civil Code § 1780, Plaintiff and Class Members seek an order enjoining Conagra from the unlawful practices described above, a declaration that Conagra's conduct violates the Consumer Legal Remedies Act, reasonable attorneys' fees and litigation costs, and any other relief authorized by CLRA that the Court deems proper.

**COUNT II**
**Violation of the California False Advertising Law ("FAL")**
**California Civil Code §§ 17500, et seq.**
**(On Behalf of Plaintiff and the California Class)**

160.     Plaintiff, individually and on behalf of the California Class, brings this cause of action and hereby adopts and incorporates by reference all allegations contained in Paragraphs 1-159 as if set fully set forth herein.

161.     The conduct described herein took place in the State of California and constitutes deceptive or false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, et seq.

162.     The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

163.     It is also unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

164.     Defendant represents to consumers, including Plaintiff and California Class Members, in its marketing and advertising and on its Products' packages that the Products are made with "only real ingredients," "ingredients sourced from nature," and "Real, Simple

Ingredients. Nothing Fake," when, in reality, they contain unnatural, human-made PFAS chemicals known to be harmful to humans and the environment.

165.    At the time of its misrepresentations, Defendant was aware that the Products contained PFAS chemicals.

166.    Defendant concealed, omitted, or otherwise failed to disclose the true nature of its Products to consumers, including Plaintiff and California Class Members.

167.    Defendant's descriptions of its Products are false, misleading, and likely to deceive reasonable consumers, and did mislead Plaintiff and California Class Members.

168.    Defendant's conduct therefore constitutes deceptive or misleading advertising under the FAL.

169.    Plaintiff has standing to pursue claims under the FAL as she reviewed and relied on Defendant's representations regarding its Products when choosing and purchasing the Products.

170.    In reliance on the statements made in Defendant's advertising and marketing materials and on the Products' packaging, and Defendant's omissions and concealment of material facts regarding the Products, Plaintiff and California Class Members purchased the Products.

171.    Had Defendant disclosed the true nature of the Products, specifically the presence of unnatural, human-made, harmful PFAS chemicals, Plaintiff and California Subclass Members would not have purchased the Products or would have paid substantially less for them.

172.    As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including but not limited to money from Plaintiff and California Class Members who paid for the Products containing PFAS chemicals.

173.    Plaintiff and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendant by means of its

deceptive or misleading representations, including monies already obtained from Plaintiff and California Class Members as provided for by the Cal. Bus. & Prof. Code § 17500, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and any other relief authorized by the FAL that the Court deems proper.

## COUNT III
### Violations of the California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200, et seq.
### (On Behalf of Plaintiff and the California Class)

174.    Plaintiff, individually and on behalf of the California Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-173 as if set fully set forth herein.

175.    Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

176.    Consumers, including Plaintiff and California Class Members, who purchased the Products, suffered an injury by virtue of buying products for which Defendant misrepresented and/or omitted the Products' true qualities and ingredients. Had Plaintiff and California Class Members known that Defendant falsely and materially misrepresented the Products and/or omit material information regarding the Products and their ingredients, they would not have purchased the Products.

177.    Defendant's conduct, as alleged herein, violates the laws and public policies of the State of California and the federal government, as set out in the preceding paragraphs of this Complaint.

178.    There is no benefit to consumers or competition by allowing Defendant to deceptively market and advertise the Products.

179.    Plaintiff and California Class Members who purchased the Products have no way of reasonably knowing that the Products are deceptively marketed and advertised; do not have the qualities they are represented to possess; contain ingredients that are not natural and/or naturally sourced; and are unsuitable for their intended use. Thus, Plaintiff and California Class Members could not have reasonably avoid the harm they suffered.

180.    Specifically, Defendant marketed, advertised and represented that the Products were made with "only real ingredients," "ingredients sourced from nature," and "Real, Simple Ingredients. Nothing Fake," when in fact the Products contain potentially harmful, unnatural, human-made PFAS chemicals.

181.    The gravity of harm suffered by Plaintiff and California Class Members who purchased the Products will suffer outweighs any legitimate justification, motive, or reason for marketing, advertising, or packaging the Products in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous, and offend the established public policies of the State of California and the federal government. Defendant's actions are substantially injurious to consumers, Plaintiff and California Class Members.

182.    Defendant's dissemination of the above-described misleading and deceptive representations to consumers throughout the State of California, including to Plaintiff and California Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's Products, and thus constitute violations of Cal. Bus. & Prof. Code §§ 17500, et seq.

183.    As a result of Defendant's unlawful, unfair and fraudulent acts and practices, Plaintiff, on behalf of herself and the California Class, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and

such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law, and any other relief authorized by UCL that the Court deems proper.

**COUNT IV**
**Violation of State Consumer Protection Statutes**
**(On Behalf of Plaintiff and the Multi-State Consumer Protection Class)**

184. Plaintiff, individually and on behalf of the Multi-State Consumer Protection Class, brings this cause of action and hereby adopts and incorporates by reference all allegations contained in Paragraphs 1-183 as if set fully set forth herein.

185. Plaintiff and Multi-State Consumer Protection Class Members have been injured as a result of Defendant's violations of the state consumer protection statutes listed above in paragraph 128 and footnote 51, which also provide a basis for redress to Plaintiff and Multi-State Consumer Protection Class Members based on Defendant's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

186. Defendant's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

187. Defendant violated the Multi-State Consumer Protection Class states' unfair and deceptive acts and practices laws by representing that their Products are made with "only real ingredients," "ingredients sourced from nature," and "Real, Simple Ingredients. Nothing Fake," when, in reality, they contain unnatural, human-made PFAS chemicals known to be harmful to humans and the environment.

188.     Defendant's misrepresentations were material to Plaintiff's and Multi-State Consumer Protection Class Members' decision to purchase the Products or pay a premium for the Products.

189.     Defendant made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

190.     As a result of Defendant's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Protection Class Members purchased and paid for Products that did not conform to Defendant's Product promotion, marketing, advertising, packaging, and labeling, and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than warranted or Products that they would not have purchased and used had they known the true facts about them

191.     As a result of Defendant's violations, Defendant has been unjustly enriched.

192.     Pursuant to the aforementioned States' unfair and deceptive practices laws, Plaintiff and Multi-State Consumer Protection Class Members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

## COUNT V
### Unjust Enrichment/Quasi-Contract
### (On Behalf of Plaintiff and the Nationwide Class)

193.     Plaintiff, individually and on behalf of the Nationwide Class, brings this cause of action and hereby adopt and incorporate by reference all allegations contained in Paragraphs 1-192 as if set fully set forth herein.

194.    Defendant's unfair and unlawful contract includes, among other things, making false and misleading representations and omissions of material fact, as set forth in this Complaint. Defendant's acts and business practices offend the established public policy of Illinois, as there is no societal benefit from false advertising, only harm. While Plaintiff and Class members were harmed at the time of purchase, Defendant was unjustly enriched by its misrepresentations and omissions.

195.    Plaintiff and Class Members were harmed when purchasing Defendant's Products as a result of Defendant's material representations and omissions, as described in this Complaint. Plaintiff and each Class Member purchased Defendant's Products. Plaintiff and Class Members have suffered injury in fact and lost money as a result of paying the price they paid for the Products as a result of Defendant's unlawful, unfair, and fraudulent business practices.

196.    Defendant's conduct allows Defendant to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment of, Plaintiff and Class Members, and to Defendant's benefit and enrichment. Defendant's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

197.    Plaintiff and Class Members confer significant financial benefits and pay substantial compensation to Defendant for its Products, which are not as Defendant represents them to be.

198.    Under common law principles of unjust enrichment and quasi-contract, it is inequitable for Defendant to retain the benefits conferred by Plaintiff's and Class Members' overpayments.

199.     Plaintiff and Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

## JURY DEMAND

200.     Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of other members of the proposed Classes, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendant as follows:

A.     Declaring that this action is a proper class action, certifying the Classes as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B.     Ordering payment of actual and punitive damages, restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class Members as a result of Defendant's unlawful, unfair and fraudulent business practices;

C.     Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

D.     Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Classes;

E.     Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

F.     Ordering such other and further relief as may be just and proper.

Dated: May 6, 2022                               Respectfully submitted,

*/s/ Melissa K. Sims*
Melissa K. Sims
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
111 West Jackson Boulevard, Suite 1700
Chicago, IL 60604
T: (815) 878-4674
*msims@milberg.com*

Melissa S. Weiner
**PEARSON, SIMON & WARSHAW, LLP**
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
T: (612) 389-0600
*mweiner@pswlaw.com*

Rachel Soffin*
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080
F: 865-522-0049
*rsoffin@milberg.com*

Harper T. Segui
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
825 Lowcountry Blvd., Suite 101
Mt. Pleasant, SC 29464
T: 919-600-5000
*hsegui@milberg.com*

Erin Ruben
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
*eruben@milberg.com*

Rachel Dapeer
**DAPEER LAW, P.A.**
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
T: 305-610-5223
*rachel@dapeer.com*

*\*Application to be admitted pro hac vice is forthcoming*

*Attorneys for Plaintiff & Proposed Classes*